1    THOMAS WALPER (State Bar. No. 96667)
     Thomas.walper@mto.com
2    SETH GOLDMAN (State Bar. No. 223428)
     Seth.goldmant@mto.com
3    BRADLEY R. SCHNEIDER (State Bar No. 235296)
     Bradley.schneider@mto.com
4    MUNGER, TOLLES & OLSON LLP
     350 South Grand Avenue
5    Fiftieth Floor
     Los Angeles, California 90071-3426
6    Telephone:    (213) 683-9100
     Facsimile:    (213) 687-3702
7

8
     Attorneys for Southern California Edison
9    Company

10

11                    UNITED STATES BANKRUPTCY COURT

12         CENTRAL DISTRICT OF CALIFORNIA, RIVERSIDE DIVISION

13

14

15   In re                                    | Case No. 6:21-bk-12821-SY

16   WESTERN COMMUNITY ENERGY,                | Chapter 9

17               Debtor.

18   WESTERN COMMUNITY ENERGY,                | Adv. No. 6:21-ap-01068-SY

19               Plaintiff,                    **SOUTHERN CALIFORNIA EDISON
                                               COMPANY'S OPPOSITION TO
20         vs.                                 DEBTOR'S APPLICATION FOR A
                                               TEMPORARY RESTRAINING ORDER**
21   SOUTHERN CALIFORNIA EDISON
22   COMPANY, a California corporation, and    Date:    June 1, 2021
     DOES 1-20 INCLUSIVE,,                     Time:    1:30 p.m.
23                                             Place:   3420 Twelfth Street
                Defendants.                             Riverside, CA 92501
24                                                      Courtroom 302

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION................................................................................1

II.   BACKGROUND................................................................................3

    A.    The RA Agreement ................................................................3

    B.    The EEI Agreement................................................................7

    C.    Western Community Energy May 24, 2021 Special Meeting ....................9

    D.    Debtor's Proposed Use of Cash ................................................10

III.  ARGUMENT ..................................................................................10

    A.    The Debtor Has Not Shown a Strong Likelihood of Success on the Merits............11

        1.    The Debtor's Request to Enjoin SCE From Withholding RA For
            Non-Payment Lacks Merit ..................................................11

        2.    The Debtor's Request to Enjoin SCE From Withholding Customer
            Remittances Lacks Merit....................................................15

    B.    The Debtor Has Not Shown a Risk of Irreparable Injury ........................16

    C.    The Balance of Hardships Favors SCE ........................................17

    D.    The Public Interest Counsels Against a TRO..................................18

IV.   CONCLUSION ................................................................................19

# **TABLE OF AUTHORITIES**

**Page**

**FEDERAL CASES**

*Bell v. Alden Owners, Inc.*,
    199 B.R. 451 (S.D.N.Y. 1996) ................................................................. 13

*In re Braniff Airways, Inc.*,
    42 B.R. 443 (Bankr. N.D. Tex. 1984) ..................................................... 15

*Citizens Bank of Md. v. Strumpf*,
    516 U.S. 16 (1995) .................................................................................. 16

*Comedy Club, Inc. v. Improv W. Assocs.*,
    553 F.3d 1277 (9th Cir. 2009) ................................................................ 12

*In re Egyptian Brothers Donut, Inc.*,
    190 B.R. 26 (Bankr D. N.J. 1995) ......................................................... 13

*In re Ike Kempner & Bros.*,
    4 B.R. 31 (Bankr. E.D. Ark. 1980) ........................................................ 14

*In re Lifestyle Furnishings, LLC*,
    418 B.R. 382 (Bankr. D. Idaho 2009) .................................................... 16

*In re Lucre, Inc.*,
    339 B.R. 648 (Bankr. W.D. Mich. 2006) ............................................... 14

*Matter of Lundell Farms*,
    86 B.R. 582 (Bankr. W.D. Wis. 1988) ................................................... 15

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ................................................................................ 17

*In re Meinke, Peterson & Damer, P.C.*,
    44 B.R. 105 (Bankr. N.D. Tex. 1984) ..................................................... 13

*Pacific Gas & Electric Co. v. State Energy Resources Conservation &
    Development Commission*,
    461 U.S. 190 (1983) ................................................................................ 13

*In re Rinard*,
    451 B.R. 12 (Bankr. C.D. Cal. 2011) ..................................................... 11

*Sierra Forest Legacy v. Rey*,
    577 F.3d 1015 (9th Cir. 2009) ................................................................ 10

*Simula, Inc. v. Autoliv, Inc.*,
    175 F.3d 716 (9th Cir.1999) .................................................................... 16

## **TABLE OF AUTHORITIES**
### (Continued)

**Page**

*In re Sportfame of Ohio, Inc.*,
    40 B.R. 47 (Bankr. N.D. Ohio 1984) ........................................................................14

*Stuhlbarg Int'l Sales Co. v. John D. Brushy & Co.*,
    240 F.3d 832 (9th Cir. 2001)....................................................................................11

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..............................................................................................10, 11

**STATE CASES**

*Sackett v. Spindler*,
    248 Cal. App. 2d 220 (1967).....................................................................................12

**FEDERAL STATUTES**

11 U.S.C. § 361 .................................................................................................................15

11 U.S.C. § 362 .................................................................................................................15

11 U.S.C. § 362(a) ............................................................................................................13

11 U.S.C. § 362(a)(3) ........................................................................................................13

11 U.S.C. § 362(b)(6) .....................................................................................................8, 12

11 U.S.C. § 362(b)(17) ...................................................................................................8, 12

11 U.S.C. § 362(b)(27) ...................................................................................................8, 12

11 U.S.C. § 362(d) ............................................................................................................16

11 U.S.C. § 363 .................................................................................................................15

11 U.S.C. § 365 .................................................................................................................14

11 U.S.C. § 503(b)(1)(A) ..................................................................................................14

11 U.S.C. § 506(a) ............................................................................................................15

11 U.S.C. § 553 .................................................................................................................15

11 U.S.C. § 556 ...............................................................................................................8, 12

11 U.S.C. § 560 ...............................................................................................................8, 12

11 U.S.C. § 561 ...............................................................................................................8, 12

# TABLE OF AUTHORITIES
### (Continued)

**Page**

28 U.S.C. § 959(b) ....................................................................................................11

**STATE STATUTES**

Cal. Pub. Util. Code § 366.2 .......................................................................................3

Cal. Pub. Util. Code § 366.2(a)(4) ..............................................................................6

**OTHER AUTHORITIES**

3 COLLIER ON BANKRUPTCY ¶ 362.02 (16th ed. 2021) ..............................................13

## I.    **INTRODUCTION**

Western Community Energy ("WCE" or the "Debtor") is a joint power authority that was established for purposes of procuring electricity for customers in several cities located in Riverside County, California.  From its inception, WCE has used defendant Southern California Edison Company ("SCE") to transmit and deliver electricity to its customers, as well as to provide other services (such as billing and collection), all of which SCE performs pursuant to contracts with the Debtor and a tariff on file with the California Public Utilities Commission ("CPUC").  Shortly after commencing this bankruptcy, the Debtor initiated this adversary proceeding and moved for a temporary restraining order ("TRO") against SCE.

The Debtor's TRO seeks to enjoin SCE (1) from withholding Resource Adequacy for non-payment from the Debtor; (2) withholding funds due to the Debtor from Debtor's customers; (3) remitting all collections billed by SCE on behalf to the Debtor to River City Bank to place in a lockbox account; (4) applying a tariff on energy resources transferred to the Debtor; (5) offsetting, or otherwise disposing of $147,000 security on deposit from the Debtor; and (6) transferring customers from Debtor to SCE.  *See Debtor's Appl. for TRO* ("TRO App."); *Debtor's Mem. of P. & A. in Supp. of App. for TRO* ("TRO Br.")

As SCE has explained to the Debtor, SCE can agree to remit customer collections to a different bank account, as the Debtor requests, subject to entry of an order from this Court.  SCE also will not transfer any of the Debtor's customers absent an order of this Court and/or the CPUC, or at the request of a WCE customer, consistent with CPUC-approved tariffs.  As a result, there is no reason for a TRO enjoining SCE from applying the $147,000 security deposit (which only applies to a mass involuntary return of WCE's customers) or adhering to its CPUC-tariff relating to such transfers.

SCE, moreover, opposes the Debtor's remaining two requests—specifically as they apply to the parties' RA Agreement (as defined below).[1]  By these requests, the Debtor improperly seeks

---

[1] As described below, the Debtor and SCE reached agreement on providing RA on June 1, 2021 under the EEI Agreement.

1   to compel performance of a contract that was terminated prepetition.  The Debtor also seeks to

2   enjoin SCE from withholding any customer remittances—a request that, if granted, would nullify

3   SCE's contractual right of setoff and destroy its secured claim.  As explained in more detail

4   below, Debtor has not satisfied its burden of showing that such relief is warranted.

5          First, the Debtor fails to establish a strong likelihood of success on the merits (as required

6   for a TRO).  SCE cannot be compelled to perform under the RA Agreement, as that agreement

7   was terminated prepetition in response to the Debtor's material breach.  Even if the RA Agreement

8   had not been terminated, the Debtor would not be entitled to compel performance absent assurance

9   that SCE's resulting administrative expense claim would be paid in full.  But that is precisely the

10  assurance the Debtor has refused to provide.

11         The Debtor similarly fails to show a strong likelihood of success on its request to enjoin

12  SCE from withholding customer remittances.  As the Debtor acknowledges, SCE has the right

13  under the RA Agreement to setoff customer remittances against amounts owed by the Debtor

14  under that agreement.  This right of setoff secures approximately $5.7 million of SCE's $15.8

15  million claim against the Debtor as of the petition date.  If the Debtor wants to preclude SCE from

16  withholding customer remittances, it must offer adequate protection of SCE's setoff right and its

17  secured claim.  Because the Debtor's TRO application fails to offer any such protection, it should

18  be denied.

19         Finally, the remaining TRO factors—risk of irreparable harm, balance of hardship, and

20  public interest—all count heavily against a TRO.  In contrast to the Debtor's unsupported

21  assertions, SCE has submitted evidence showing that, if SCE bears the costs of providing RA to

22  the Debtor (for the benefit of its customers) because the Debtor defaults, those costs will be

23  recovered from SCE's other customers.  That is because such procurement costs are passed

24  directly through to customers and recovered in rates.  SCE does not make any profit or otherwise

25  collect a fee on such costs, but those costs will nevertheless increase costs for other customers.

26  Hence, if the Debtor's requests with respect to the RA Agreement are granted, the Debtor will

27  impose its operating losses onto SCE's other customers—a result that is wholly inequitable and

28  contrary to the California Public Utilities Code.

1    For these reasons, SCE respectfully requests that the Court deny the TRO.

2    **II.    <u>BACKGROUND</u>**

3    The California Public Utilities Code allows cities, states, and joint power authorities

4    ("JPAs") to participate in community choice aggregation ("CCA") programs under which they can

5    procure electricity for customers located in their jurisdictional boundaries.  *See* Cal. Pub. Util.

6    Code § 366.2.  On or about August 12, 2018, the Debtor was established as a JPA for the purposes

7    of implementing a CCA program in seven cities located in Riverside County:  Canyon Lake,

8    Eastvale, Hemet, Jurupa Valley, Norco, Perris, and Wildomar.  Since about April 2020, the Debtor

9    has been procuring electricity for customers in this service territory, while SCE continued

10    providing transmission and distribution services for these customers.  *See* Declaration of Josh

11    Copenhaver in Support of Southern California Edison's Opposition to Debtor's Application for a

12    Temporary Restraining Order ("Copenhaver Decl.") ¶ 3.

13    The territory covered by the Debtor's CCA program is in SCE's service territory.

14    Accordingly, as is statutorily required for CCAs, the Debtor contracted with SCE for billing and

15    metering services for its CCA program.  Pursuant to these services, SCE collects WCE customers'

16    remittances and sends those remittances to WCE on a regular basis.  *Id.* ¶ 4.

17    In addition to these services, SCE entered agreements with the Debtor under which SCE

18    agree to allocate or transfer Resource Adequacy ("RA") for the Debtor's benefit.  *Id.* ¶ 5.  RA

19    refers to a month-ahead requirement that the CPUC imposes on load-serving entities, including

20    CCAs and SCE, to show that they have purchased sufficient capacity commitments to meet

21    forecasted power demand, with a required margin, for their customers.  *Id.*  SCE agreed to provide

22    RA to the Debtor pursuant to two agreements, which are described below.

23    **A.    <u>The RA Agreement</u>**

24    On August 15, 2019, SCE and the Debtor entered into a contract entitled *Agreement*

25    *Between Southern California Edison Company and Western Community Energy Regarding WCE*

26    *Implementation and Resource Adequacy Compliance for 2020, 2021 and 2022* (the "RA

27

28

1    Agreement").[2]   A true and correct copy of the RA Agreement is attached as Exhibit A to the

2    Copenhaver Declaration.  Under the RA Agreement, the Debtor agreed to purchase RA from SCE

3    for 2020, 2021, and 2022.  In particular, SCE agreed to satisfy the Debtor's 2020 RA obligations

4    on the Debtor's behalf.  SCE further agreed that for 2021 and 2022, it would transfer RA resources

5    to the Debtor each month and show that RA to the California Independent System Operator

6    ("CAISO") so the Debtor could satisfy its monthly RA obligations.  The amount due to SCE for

7    RA is set out in Section J of the agreement. *See* Copenhaver Decl. ¶ 6.

8         Significantly, Section J(c) expressly provides that "SCE has the right to set off WCE's

9    customer remittances against any payment due to SCE under this Agreement that remains unpaid

10   sixty (60) calendar days from the date of SCE's invoice." *Id*., Ex A at p. 7.  The Debtor

11   acknowledges this setoff right.  *See* Compl. ¶ 16 ("Pursuant to the RA Agreement, Defendant has

12   the right to set off the Customer remittances against any payment due to Defendant under the RA

13   Agreement that has been unpaid for sixty (60) days."); TRO App. at 4 (acknowledging that SCE

14   has "various rights and powers under the Agreements, including the ability . . . [to] withhold funds

15   due to Debtor from Debtor's customers").

16        In 2020, SCE provided the Debtor with the required RA in exchange for which it was

17   entitled to be paid approximately $12.8 million.  *See* Copenhaver Decl. ¶ 8.  This obligation came

18   due on February 15, 2021, but the Debtor failed to pay.  *Id*.  On February 16, 2021, SCE notified

19   the Debtor by letter that, as a consequence of the non-payment, the Debtor was in material breach

20   of the RA Agreement.  *Id*., Ex. B. Pursuant to Section T of the RA Agreement, SCE gave the

21   Debtor fifteen days to cure the default.  *Id*.

22        The Debtor failed to cure its payment default.  On March 12, 2021, SCE sent the Debtor a

23   letter notice of the Debtor's failure to cure its default by paying the full amount of $12,868,870,

24   plus accrued interest.  Copenhaver Decl. ¶ 9, Ex. C.  SCE also provided notice that, effective

25   March 15, 2021, it would stop transfers of RA to the Debtor unless the Debtor cured its default or

26

27   [2] In its Complaint and TRO papers, the Debtor refers to this contract as the "RA Agreement," so
     SCE will use the same term.  The contract has also been referred to by the parties as the
28   "Implementation Agreement" or the "CSRP RA Agreement."

1  the parties reached an alternative satisfactory arrangement.  *Id*.  Finally, SCE notified the Debtor

2  that its default under the RA Agreement also may constitute a default under the parties' EEI

3  Agreement (as defined below).  *Id*.

4  Thereafter, the Debtor and SCE engaged in discussions to try to resolve the payment

5  default.  *Id*. ¶ 10.  During that period, SCE continued to transfer RA to the Debtor and, while the

6  Debtor made two good faith payments totaling $1,075,510.80, the discussions ultimately failed to

7  resolve the Debtor's default.  *Id*.  On May 24, 2021, SCE notified the Debtor by letter that, as a

8  result of the Debtor's uncured material default of the RA Agreement, SCE was terminating the RA

9  Agreement, effective at 10:50 a.m. that day.  *Id*., Ex. D.  The Debtor commenced its case later that

10  day (ECF No. 1).  Thus, as of the commencement of this bankruptcy, the RA Agreement had been

11  terminated.

12  In its application for a TRO, the Debtor states that SCE terminated the RA Agreement

13  based on a default under the EEI Agreement.  TRO App. at 4.  But this is inaccurate.  As explained

14  above, SCE's May 24, 2021 letter to the Debtor makes clear that SCE was terminating the RA

15  Agreement based on the Debtor's failure to timely cure its material payment default under the RA

16  Agreement, not based on a default of the EEI Agreement.  SCE also notified the Debtor that the

17  Debtor's default under the RA Agreement triggered a cross-default under the EEI Agreement, but

18  the cross-default was not the basis for the termination of the RA Agreement.

19  Before terminating the RA Agreement, SCE continued to make monthly transfers of RA to

20  the Debtor through May 2021, which covered the Debtor's RA obligations through June 2021.

21  Copenhaver Decl. ¶ 11.  Excluding interest, the Debtor owes SCE approximately $2.9 million for

22  RA supplied in 2021, in addition to the $12.8 million for 2020.  *Id*.

23  SCE's claim against the Debtor under the RA Agreement is secured in several ways.  *First*,

24  as security for its obligations under the RA Agreement, the Debtor procured a letter of credit from

25  Barclays Bank PLC in the amount of $4.5 million (the "Barclays LOC").  *Id*. ¶ 12.  SCE submitted

26  a draw request on the Barclays LOC and has received the proceeds.  *Id*.  *Second*, the Debtor

27  prepaid SCE for $4.5 million of RA.  *Id*.  *Third*, the Debtor made two additional payments to SCE

28

1  totaling $1,075,510.80. *Fourth* and finally, SCE's claim is secured by its right to setoff customer

2  remittances pursuant to Section J(c) of the RA Agreement. *Id.*

3      Including the security provided by its right of setoff, SCE's claim against the Debtor is

4  fully secured. Specifically, SCE's claim against the Debtor under the RA Agreement totals

5  approximately $15.8 million ($12.8 million plus $2.9 million). This exceeds the Barclays LOC

6  proceeds and cash by approximately $5.7 million ($15.8 million minus $10.1 million ($4.5 million

7  Barclays LOC minus $4.5 million cash minus $1.075 million payments)). *Id.* ¶ 13. SCE's net

8  $5.7 million claim is secured by SCE's right of setoff against WCE customer remittances, making

9  it a secured claim. SCE estimates that there are approximately $8.5 million of customer

10 remittances due to the Debtor as of May 23, 2021 (the day before the Debtor commenced its

11 bankruptcy case). *Id.*

12     To the extent that the Court orders SCE to remit the customer receipts without offset for

13 this amount or some other form of adequate protection, SCE's other customers will be harmed

14 because they will be obligated to pay for the RA that SCE sold to WCE. *Id.* As explained above,

15 SCE does not earn a profit on its energy procurement service. Rather, SCE has the right to recover

16 the costs of the capacity and energy in its procurement portfolio from its customers on a pass-

17 through basis pursuant to CPUC oversight. Accordingly, the Debtor's payment default, absent the

18 right of offset, will result in a loss that will be incorporated into SCE procurement costs, and

19 SCE's other customers will pay that amount as part of their rates, contrary to numerous statutory

20 provisions prohibiting cost shifting among customers as a result of CCA programs. *See* Cal. Pub.

21 Util. Code §§ 366.2(a)(4) ("The implementation of a community choice aggregation program shall

22 not result in a shifting of costs between the customers of the community choice aggregator and the

23 bundled service customers of an electrical corporation"), 366.2(d)(1) ("It is further the intent of the

24 Legislature to prevent any shifting of recoverable costs between customers"), 366.3, 365.2 ("The

25 commission shall ensure that bundled retail customers of an electrical corporation do not

26 experience any cost increases as a result of retail customers of an electrical corporation electing to

27 receive service from other providers."). In effect, the Debtor's operating losses, to the extent

28

1  absorbed by SCE, would be funded by SCE's energy procurement customers.  *See* Copenhaver

2  Decl. ¶ 13.

3       **B.**       **The EEI Agreement**

4       SCE also agreed to transfer RA to the Debtor pursuant to Master Power Purchase and Sale

5  Agreement Confirmation Letters dated as of October 29, 2020, and January 11, 2021, each of

6  which is governed by the Edison Electric Institute ("EEI") Master Power Purchase and Sale

7  Agreement between the Parties, effective as of October 28, 2020, along with the Cover Sheet, any

8  amendments and annexes thereto including the EEI Collateral Annex to the Master Agreement

9  along with the Paragraph 10 to the Collateral Annex between the Parties (collectively, the "EEI

10 Agreement").  *See* Copenhaver Decl. ¶ 14.

11      As of the commencement of WCE's bankruptcy case, the Debtor owes approximately

12 $2.619 million to SCE for RA provided under the EEI Agreement through the showing for the

13 month of June 2021.  *Id.* ¶ 15.  If SCE provides the next-scheduled RA transfer on June 1, 2021,

14 which would cover the transfer of RA to the Debtor under the EEI Agreement for July 2021, it

15 will be owed an additional $1.5 million.  *Id.*  SCE's right to payment under the EEI Agreement is

16 secured by (1) a $1,823,600 letter of credit from Barclays Bank PLC (the "EEI LOC"), for which

17 SCE submitted a draw request and has received the proceeds, and (2) $2.3 million cash collateral

18 that the Debtor previously advanced to secure its payment obligations under the agreement.  *Id.*

19 This security is sufficient to cover the Debtor's current obligations under the EEI Agreement as

20 well as the obligation it would incur to SCE if SCE provides RA on June 1, 2021 (leaving a

21 balance of $4,600).  *Id.*

22      On May 24, 2021, prior to WCE's commencement of its chapter 9 bankruptcy case, SCE

23 delivered a Notice of Termination and Early Termination Date in accordance with the EEI

24 Agreement.  *Id.*¶ 16, Ex. E.  As noted therein, the default under the RA Agreement constituted a

25 cross-default of the EEI Agreement as a Specified Energy Transaction default under Section 5.1(i)

26 of the EEI Agreement, and SCE designated May 25, 2021 as the Early Termination Date in

27 accordance with the EEI Agreement.  *Id.*  Further, WCE failed to post additional collateral in the

28

1    amount of $1,100,000 by May 24, 2021 and pay $400,000 by May 20, 2021, in each case by 5:00

2    p.m. local time, the date and time due for performance under the EEI Agreement. *Id*.

3         After the Debtor filed its motion for a TRO, SCE informed the Debtor that, subject to its

4    reservation of rights, it was prepared to provide the RA on June 1, 2021 (covering July RA

5    obligations) under the EEI Agreement if the Debtor would confirm its agreement that SCE could

6    apply the Debtor's cash deposit to satisfy the $1.5 million that will be owed for the June RA.  The

7    Debtor confirmed its agreement via email on May 29, 2021.  To meet the July RA requirement,

8    SCE must provide the RA by 2 p.m. pacific standard time on June 1, 2021 (the date of this filing),

9    at which point the provision of the RA becomes irrevocable.  Accordingly, SCE understands that

10   any issue relating to the provision of RA on June 1, 2021 for the month of July 2021 under the EEI

11   Agreement has been resolved.  No agreement, however, exists as to any other future performance

12   under the EEI Agreement.[3]  *See* Copenhaver Decl. ¶ 17.

13        To the extent the Court issues a Temporary Restraining Order that relates to SCE's

14   performance under the EEI Agreement, SCE respectfully requests that it be limited to the

15   following agreement reached between SCE and the Debtor:  "Subject to its reservation of rights

16   below, SCE shall perform the July showing of resource adequacy on June 1, 2021 under the EEI

17   Agreement and SCE is authorized to apply $1.5 million of the cash it holds under the EEI

18   Agreement in payment for that performance.  SCE reserves all rights regarding whether the EEI

19   Agreement has been terminated as of May 25, 2021, all rights under the EEI Agreement, and all

20   rights with respect to future performance under the EEI Agreement."

21

22

23

24

---

[3] SCE reserves all rights with respect to the application of 11 U.S.C. §§ 362(b)(6), (17), (27), 556,
25   560, and 561.  SCE notes, however, that the Debtor fails to address that if the EEI Agreement is a
forward contract or swap agreement or master netting agreement and SCE is a forward contract
26   merchant or financial participant, then the EEI Agreement terminated as of May 25, 2021 and SCE
is entitled to close-out the agreement and net all transactions including Specified Energy
27   Transactions that qualify as forward contracts or swap agreements notwithstanding the automatic
28   stay.

**C.    Western Community Energy May 24, 2021 Special Meeting**

Attached as Exhibit F to the Copenhaver Declaration are the May 24, 2021 WCE Special Meeting Agenda, Materials, and Proposed Resolutions.  (This document is publicly available at the following website:  http://westerncommunityenergy.com/wp-content/uploads/2021/05/wce052421.pdf.)

As set forth in the Staff Report dated May 24, 2021, WCE is generally not paying its debts as they become due.  Further, "[w]ithout an immediate injection of working capital, WCE will be unable to pay its bills as they become due."  This led to the presentation of a resolution for the board of directors of WCE to determine:

> (a) WCE does not have sufficient financial resources to meet its fiscal obligations as they become due or to purchase power under current market conditions, including the ability to post collateral as required by power providers; and

> (b) WCE will not be able to provide power to supply its customers with electricity in the normal course of business within the next sixty (60) days.

Copenhaver Decl., Ex. F at p. 28 (Attachment 1 to Item 7.A Staff Report).

As a result, the resolution set forth the findings for the board to declare a fiscal emergency and that "such fiscal emergency jeopardizes the health, safety and well-being of the residents who receive electrical service from WCE within its service area by potentially depriving them of an essential utility service heading into the summer months . . . ."  *Id.*  WCE therefore commenced this chapter 9 case.

However, the staff report makes clear that commencing this case does not resolve the fiscal emergency that threatens the health, safety and well-being of the residents by potentially depriving them of electric service.  As stated therein: "WCE's projected cash flows show deficits that reach individual monthly totals of up to $40 million over the next two years, and even then, only after raising customer rates by 15% to 30% in each of those years."  *See id.* at p. 22 (Item 7.A Staff Report).  The Debtor's immediate focus on the month of June does not provide any information about July or subsequent months.  Nor does it resolve the substantial cash flow deficits that the Debtor projects.  Even if the relief requested by the Debtor were granted, it would not resolve the

1    Debtor's cash flow problems.  Rather, the relief would accelerate some revenue and prioritize

2    certain claims (at the expense of other claims, including SCE's secured right of setoff).  There is

3    no reason to conclude that the Debtor will not fail by the end of June or in July.  Nor is there any

4    basis to conclude that if SCE remits all revenue received that there will be sufficient assets to pay

5    SCE's presently secured claim of $5.7 million.

6          **D.**      **Debtor's Proposed Use of Cash**

7          The Debtor filed an *Emergency Motion to Determine Adequacy of Adequate Protection to*

8    *River City Bank for the Benefit of PPA Providers; Memorandum of Points and Authorities and*

9    *Declarations of Andrew Ruiz and David M. Goodrich in Support Thereof* (ECF No. 11).  The

10   Debtor projects that it will receive $9.6 million in remittances from SCE in June.  Along with $2.2

11   million presently in the Debtor's bank account, it projects using $3.7 million to pay for power

12   purchases, and $5.2 million to pay CAISO.  The Debtor projects a balance of $2.9 million at the

13   end of June for operations.  No information is provided regarding what operational expenses

14   would be paid from the $2.9 million.  Even if one assumes the Debtor's projections are accurate,

15   after accounting for operational expenses, the Debtor will not have sufficient cash to provide

16   adequate protection of SCE's $5.7 million secured claim.  If SCE retains that amount from

17   remittances, the Debtor has a deficit of $2.8 million after paying PPA Providers and CAISO and

18   before operational expenses.

19   **III.**    **ARGUMENT**

20         To obtain a TRO, the Debtor has the burden of showing that it is "likely to succeed on the

21   merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the

22   balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Winter v.*

23   *Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *see also Sierra Forest Legacy v. Rey*, 577 F.3d

24   1015, 1021 (9th Cir. 2009).  "A preliminary injunction is an extraordinary remedy never awarded

25

26

27

28

1   as of right." *Winter*, 55 U.S. at 24.[4]  Accordingly, a court should enter a preliminary injunction

2   only "upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

3          As shown below, the Debtor has not established any of the elements required for the

4   injunctive relief that it seeks with respect to the RA Agreement.[5]

5          **A.      The Debtor Has Not Shown a Strong Likelihood of Success on the Merits**

6          By its TRO application, the Debtor seeks to enjoin SCE from "(1) withholding Resource

7   Adequacy for non-payment from Debtor [or] (2) withholding funds due to Debtor from Debtor's

8   customers[.]"  TRO App. at 2; TRO Br. at 9.  The Debtor has not shown a "strong likelihood of

9   success on the merits" as to either request, as required for a TRO.  *See In re Rinard*, 451 B.R. 12,

10  22 (Bankr. C.D. Cal. 2011) (noting that an application for a TRO must show a strong likelihood of

11  success on the merits).

12         **1.      The Debtor's Request to Enjoin SCE From Withholding RA For Non-
                    Payment Lacks Merit**

13

14         The Debtor's request to enjoin SCE from withholding RA under the RA Agreement for

15  non-payment fails for a fundamental, threshold reason.  In its May 24, 2021 letter to the Debtor,

16  SCE terminated the RA Agreement based on the Debtor's material breach, which the Debtor had

17  failed to cure within the time allowed by the agreement.  As shown above, SCE's termination was

18  effective before the Debtor commenced its bankruptcy case.  Because the RA Agreement was

19  terminated prepetition, the Debtor can no longer exercise any rights under that contract, including

20  compelling SCE to perform.

21         The Debtor does not challenge the validity or effectiveness of SCE's termination of the RA

22  Agreement.  Nor could it plausibly.  Under California law, a material breach gives the non-

23  _____

24  [4] The standards for issuing a TRO and a preliminary injunction are "substantially identical."
    *Stuhlbarg Int'l Sales Co. v. John D. Brushy & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

25
    [5] As noted above, SCE will not transfer any of the Debtor's customers absent an order of this
26  Court and/or the CPUC, or at the request of a WCE customer, consistent with CPUC-approved
    tariffs.  This should moot the Debtor's request to enjoin SCE from applying the $147,000 deposit,
27  or enjoin application of the tariff to transfers of energy to the Debtor.  To the extent not, these
    request should be denied, as inconsistent with applicable law.  28 U.S.C. § 959(b).
28

1  breaching party the right to terminate the contract.  *See, e.g.*, *Comedy Club, Inc. v. Improv W.*

2  *Assocs.*, 553 F.3d 1277, 1289 n.12 (9th Cir. 2009); *Sackett v. Spindler*, 248 Cal. App. 2d 220, 240

3  (1967).  Here, there can be no question that the Debtor's payment default under the RA

4  Agreement—which consisted of a failure to pay $12.8 million related to 2020 RA—was material.

5  Given that the Debtor failed to cure this default within the time specified by the agreement, SCE

6  had the right to terminate.

7        In its moving brief, the Debtor nevertheless attempts to justify a TRO enjoining SCE from

8  withholding performance under the RA Agreement by arguing that (1) the RA Agreement is not a

9  "commodities contract" for purposes of the Section 556 safe harbor; (2) the Bankruptcy Code

10  "preempts" SCE's contractual rights; and (3) the automatic stay applies to prohibit SCE's

11  "contemplated" actions.  TRO Br. at 3-6.  None of these arguments has merit.

12        *First*, SCE's right to terminate the RA Agreement prepetition based on the Debtor's

13  material breach does not turn on whether the agreement was a "commodities contract."  As noted

14  above, SCE's right to terminate the RA Agreement in response to the Debtor's uncured material

15  breach arose from state law.  SCE would only need to rely on a safe harbor if the RA Agreement

16  was not terminated prepetition.  *See* 11 U.S.C. § 556 (providing that the contractual right to

17  liquidate, terminate, or accelerate commodity contract or forward contract "shall not be stayed,

18  avoided, or otherwise limited by operation of . . . this title").  Since the Debtor has not contested

19  the prepetition termination, the Section 556 safe harbor is a red herring.[6]

20        *Second*, the Debtor's assertion that the Bankruptcy Code preempts SCE's state law right of

21  termination is groundless.  The Debtor cites no authority holding that the Bankruptcy Code or

22

23

24  _____

25  [6] SCE reserves all rights with respect to the application of 11 U.S.C. §§ 362(b)(6), (17), (27), 556,
560, and 561.  SCE notes, however, that the Debtor fails to address that if the RA Agreement is a

26  forward contract or swap agreement and SCE is a forward contract merchant or financial
participant, then the RA Agreement may be terminated postpetition in any event and SCE is

27  entitled to terminate and close-out the agreement and exercise all rights of setoff notwithstanding
the automatic stay.

28

SCE'S OPPOSITION TO DEBTOR'S APPLICATION FOR A TRO

1   other federal law preempts state law allowing a contract counterparty to terminate a contract for

2   material breach prior to the breaching party's bankruptcy filing.[7]

3        The Debtor suggests that it is relying on an implied preemption theory, asserting that "for a

4   state law to be preempted based upon implied conflict, there must be an actual conflict between

5   state and federal law or it must be impossible for both state and federal law to apply."  TRO Br. at

6   4.  But the Debtor does not identify any conflict between the Bankruptcy Code and SCE's pre-

7   petition termination rights.  Nor does the Debtor show that it would be impossible to comply with

8   both state and federal law in this context.

9        *Third*, the Debtor's invocation of the automatic stay is likewise unavailing.  As explained

10  above, the automatic stay only came into effect on the Petition Date.  *See* 11 U.S.C. § 362(a)

11  (providing that "a petition filed" under chapter 11 "operates as a stay"); 3 COLLIER ON

12  BANKRUPTCY ¶ 362.02 (16th ed. 2021) ("The stay is effective automatically and immediately upon

13  the filing of a bankruptcy petition, whether voluntary, joint or involuntary.").  Because SCE

14  terminated the RA Agreement before the Debtor's bankruptcy petition filing, the termination did

15  not violate the automatic stay.  *See In re Egyptian Brothers Donut, Inc*., 190 B.R. 26, 31 (Bankr D.

16  N.J. 1995) (noting that "a debtor cannot assume an executory contract or a lease which was validly

17  terminated prior to the institution of bankruptcy proceedings."); *Bell v. Alden Owners, Inc.*, 199

18  B.R. 451, 458 (S.D.N.Y. 1996) (noting that "a bankruptcy court does not have power to resurrect a

19  lease which was terminated prior to the filing of the lessee's bankruptcy petition"); *In re Meinke,*

20  *Peterson & Damer, P.C.*, 44 B.R. 105, 108 (Bankr. N.D. Tex. 1984) (holding that, where

21  insurance policy expired by its terms before bankruptcy, the debtor could not "avail itself of the

22  automatic stay protection offered by Section 362(a)(3)").

23

24

25

_____

26  [7] The only preemption case cited by the Debtor, *Pacific Gas & Electric Co. v. State Energy*

27  *Resources Conservation & Development Commission*, 461 U.S. 190 (1983), addressed an entirely
    unrelated issue, namely, whether the Atomic Energy Act preempted state law governing the

28  construction of nuclear power plants.  *Id*. at 194-95.

1                                                    ****

2          Even if SCE had not terminated the RA Agreement before the Petition Date, there would

3   still not be a valid legal basis for the Debtor's request to restrain SCE from withholding RA for

4   non-payment.  If the RA Agreement was not terminated, the Debtor is still in material breach of

5   the agreement and therefore should not be allowed to compel SCE to perform.  *See In re Lucre,*

6   *Inc.*, 339 B.R. 648, 662 (Bankr. W.D. Mich. 2006) (rejecting debtor's argument that it could

7   compel performance from a counterparty to an executory under section 365, where the debtor had

8   materially breached the agreement pre-petition).  If the Debtor wants to continue receiving

9   benefits of the RA Agreement, it can move to assume the agreement under section 365, but that, of

10  course, would require the Debtor to cure its non-monetary defaults and provide adequate assurance

11  of future performance.

12         Notably, even where courts have compelled performance postpetition but pre-assumption,

13  they have generally conditioned their order on the debtor paying the contract price in advance or

14  upon receipt of the goods.  *See, e.g.*, *In re Sportfame of Ohio, Inc.*, 40 B.R. 47, 53 (Bankr. N.D.

15  Ohio 1984) (ordering supplier to resume shipping goods on condition that "[t]he debtor shall be

16  required to pay cash either in advance or upon receipt of goods"); *In re Ike Kempner & Bros.*, 4

17  B.R. 31, 32-33 (Bankr. E.D. Ark. 1980) (ordering supplier to continue shipping on condition that

18  the debtor pay the supplier prior to shipment).  This makes sense given that a contract counterparty

19  is entitled to an administrative expense claim for post-petition services.  11 U.S.C § 503(b)(1)(A).

20  If the debtor cannot pay for goods in advance or upon delivery, that signals that the debtor is likely

21  administratively insolvent—in which case, no purpose is served by compelling the counterparty to

22  perform.

23         Here, there is no question that, if SCE were to transfer RA to the Debtor under the RA

24  Agreement, its right to payment for that RA would be entitled to administrative priority.  Thus, to

25  the extent that the Debtor seeks to compel postpetition performance of the RA Agreement by SCE,

26  the Debtor should show that it can pay for SCE's provision of RA.  Yet, the Debtor has not

27  provided any evidence that it has the financial resources to pay the amounts that the Debtor would

28  owe to SCE under the RA Agreement if SCE continued to provide RA postpetition under that

1  agreement.  Indeed, the information that is available regarding the Debtor's financial position

2  indicates that it affirmatively cannot pay for the RA that has already been delivered to date nor any

3  additional RA in the future under the RA Agreement.  For this reason, the Debtor's request to

4  enjoin SCE from withholding RA for non-payment should be denied.

5          **2.      The Debtor's Request to Enjoin SCE From Withholding Customer
                    Remittances Lacks Merit**

6

7          The Debtor's arguments fare no better with respect to its request for a TRO enjoining SCE

8  from withholding customer payments.

9          As the Debtor admits, the RA Agreement expressly provides that SCE has the right to

10  setoff customer remittances against any payment due to SCE under the RA Agreement that

11  remains unpaid sixty days after the date of SCE's invoice.  Far from being "preempted" by the

12  Bankruptcy Code (TRO Br. at 4), this contractual right of setoff is expressly preserved by section

13  553 of the Code.  *See* 11 U.S.C. § 553.  The Debtor fails to cite section 553 in its brief, let alone

14  explain why it would not apply here.  Thus, the Debtor's suggestion that SCE's contractual setoff

15  right under the RA Agreement is preempted can be rejected out of hand.

16          Section 553, moreover, is not the only provision of the Bankruptcy Code that protects

17  SCE's right of setoff.  Under Section 506(a), to the extent that SCE has a right of setoff against

18  customer remittances payable to the Debtor, SCE's claim is secured and entitled to adequate

19  protection, like any other secured claim.  *See* 11 U.S.C. § § 506(a), 361, 362.  The Debtor's

20  request to enjoin SCE from withholding customer remittances—against which SCE holds a right

21  of setoff—undermines SCE's security, rather than providing the adequate protection to which SCE

22  is entitled.  *See In re Braniff Airways, Inc.*, 42 B.R. 443, 452–53 (Bankr. N.D. Tex. 1984) (noting

23  that the effect of section 506(a)'s incorporation of sections 362 and 363 "is to permit elimination

24  of the setoff right only if the debtor provides adequate protection"); *Matter of Lundell Farms*, 86

25  B.R. 582, 592–93 (Bankr. W.D. Wis. 1988) (holding that debtor failed to demonstrate that

26  creditor's right of setoff was adequately protected under section 362).  SCE estimates that there

27  are approximately $8.5 million of customer remittances due to the Debtor as of May 23, 2021 (the

28  day before the Debtor commenced its bankruptcy case).  If SCE is compelled to remit those funds

1  without exercising its set off rights, it will be deprived of its setoff rights—which secures its right

2  to payment under the RA Agreement.  That outcome would violate SCE's right to adequate

3  protection of its secured claim.

4       The Debtor's request to preclude SCE from withholding customer remittances effectively

5  seeks a preemptive ruling that SCE cannot exercise a right of setoff.  But the Debtor has provided

6  no legal or factual basis for such a determination.  To the contrary, as noted above, the Debtor

7  admits that SCE has a contractual setoff right.  Furthermore, the Debtor admits that even under its

8  proposal, there will only be $2.9 million of cash remaining at the end of June.  That is less than

9  SCE's present $5.7 million secured claim.  As a result, there is no adequate protection of SCE's

10  secured claim.  In effect, SCE and its customers would be an involuntary lender to the Debtor.  In

11  light of these admissions, the Debtor cannot show a probability—let alone a strong likelihood—of

12  succeeding on the merits of its request to enjoin SCE from withholding customer remittances.

13       SCE is cognizant of the automatic stay.  To date, it has not ceased remittances.  It is

14  preparing to do so to the extent of its secured $5.7 million claim and to seek confirmation from

15  this Court that the stay does not apply or that it is entitled to stay relief or some other form of

16  adequate protection.  SCE will take guidance from the Court on that motion at the emergency

17  hearing on June 1.  SCE notes, however, that its mere withholding of customer funds does not

18  constitute a set off and therefore would not require relief from the automatic stay.  *See Citizens*

19  *Bank of Md. v. Strumpf*, 516 U.S. 16, 19 (1995) (holding that bank's placement of an

20  "administrative hold" on debtor's account and subsequent refusal to pay out on account was not an

21  offset); *In re Lifestyle Furnishings, LLC*, 418 B.R. 382, 388 (Bankr. D. Idaho 2009) (holding that

22  bank's administrative hold was "merely a temporary refusal by Wells Fargo to pay its debt, giving

23  it time to promptly seek relief from the automatic stay under § 362(d) and exercise its right to

24  offset").

25       **B.    <u>The Debtor Has Not Shown a Risk of Irreparable Injury</u>**

26       The Ninth Circuit has made clear that, in order to obtain preliminary injunctive relief, a

27  plaintiff must demonstrate a "significant threat of irreparable injury" in the absence of a TRO.

28  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir.1999).  A plaintiff can only satisfy this

1    element with evidence, not unsupported assertions.  Indeed, "a plaintiff's motion for preliminary

2    injunctive relief" has a "requirement for substantial proof [that] is much higher" than a defendant's

3    summary judgment motion.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

4         Here, the Debtor has not adduced *any* evidence of a threat of irreparable injury, let alone

5    the significant threat required to obtain a TRO.  The Debtor simply *asserts* that, absent a TRO, it

6    "will no longer be able to operate, and as a result, will suffer irreparable injury."  TRO Br. at 7.

7    But the Debtor offers no evidence to support this bare assertion—not even a single declaration or

8    exhibit that would substantiate its assertion.  Significantly, given the broader ongoing financial

9    difficulties of the Debtor, the Debtor may only be temporarily delaying a shutdown of operations.

10    Absence some evidence that the Debtor is not doomed to fail, there is no basis to conclude that the

11    Debtor will suffer irreparable harm if the TRO is denied.  It will suffer the same harm regardless

12    of the outcome of the Application.  The Debtor's showing of irreparable harm thus fails for want

13    of any supporting evidence.

14         **C.    <u>The Balance of Hardships Favors SCE</u>**

15         The balance of hardships favors SCE, not the Debtor.  As shown above, if granted, the

16    TRO would compel SCE to (1) perform under a terminated contract without any reasonable

17    assurance of payment and (2) forfeit its contractual right of setoff, thereby depriving SCE of

18    critical security for its claim against the Debtor and harming utility customers in general by

19    foisting the Debtor's failures onto other customers.

20         Against this palpable injury to SCE and its customers, the Debtor simply asserts that,

21    absent a TRO, "Debtor will suffer the irreparable injury of having to cease its operations and close

22    its doors."  TRO Br. at 7.  But, as with its "showing" with respect to irreparable, the Debtor does

23    not support this assertion with any competent evidence.  Accordingly, the Debtor's assertions are

24    not entitled to any weight.

25         The Debtor also attempts to minimize the potential injury to SCE, suggesting that "[a]ny

26    additional damages that SCE could suffer could be remedied with a money judgment if the

27    preliminary injunction is ultimately dissolved."  TRO Br. at 7.  But a "money judgment"—by

28

1  which the Debtor presumably means a claim against the Debtor's estate—would only compensate

2  SCE for an injury if the Debtor can pay the claim.

3       If the Debtor can pay a future claim, it should provide SCE with adequate protection for its

4  setoff right, as well as adequate assurance of payment for additional future performance.

5  Conversely, if the Debtor can only operate by depriving SCE of its contractual right of setoff and

6  to adequate protection, the Debtor's promise of a future "money judgment" is an empty one.  It

7  merely results in SCE and its customers becoming involuntary lenders to the Debtor.

8       **D.**    **The Public Interest Counsels Against a TRO**

9       The public interest also cuts against granting a TRO.

10  *First*, while the Debtor contends that this factor is equivalent to the "interests of creditors

11  in a bankruptcy estate" (TRO Br. at 8), it ignores that SCE is one of the Debtor's largest and

12  critically important creditors.  A TRO enjoining SCE from withholding RA for non-payment

13  would not serve SCE's interest or that of the Debtor's other creditors.  To the contrary, it would

14  only increase the amount of claims against the estate.

15  *Second*, if SCE is compelled to provide RA to the Debtor without compensation, SCE will

16  need to recover its unpaid expenses from its customers.  In other words, the Debtor seeks to shift

17  the risk that it will be unable to satisfy SCE's claims from the Debtor's estate to SCE's customers.

18  Such a windfall benefit—taken at the expense of SCE's customers—would not be in the public

19  interest of the California Public Utilities Code.

20  *Finally*, the public has an interest in ensuring the provision of electric service.  As the

21  Debtor admits, its financial state constitutes a fiscal emergency that "jeopardizes the health, safety,

22  and well-being of the residents who receive electrical service from WCE within its service area by

23  potentially depriving them of an essential utility service heading into the summer months." *See*

24  Voluntary Petition at p. 6 (Resolution Number 2021-10), No. 6:21-bk-12821-SY, ECF No. 1.  The

25  Debtor's proposed plan of action for June depends on violating SCE's rights and forcing it to fund

26  the Debtor's operations through June with no assurance of repayment and no indication that there

27  is any hope the Debtor can continue operating in the future.  Moreover, absent additional working

28

1    capital or positive cash flow, the Debtor's proposed TRO will not serve the best interests of

2    residents who receive electrical service from WCE.

3    **IV.**    **CONCLUSION**

4        SCE respectfully requests that the Court deny the Debtor's application for a TRO.

5    DATED:  June 1, 2021                              MUNGER, TOLLES & OLSON LLP

6

7                                                     By:    _/s/ Seth Goldman_

8                                                            SETH GOLDMAN
                                                     Attorneys for Southern California Edison Company
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCE'S OPPOSITION TO DEBTOR'S APPLICATION FOR A TRO

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

350 S. Grand Ave., FL 50
Los Angeles, CA 90071

A true and correct copy of the foregoing document entitled (*specify*):

**SOUTHERN CALIFORNIA EDISON COMPANY'S OPPOSITION TO DEBTOR'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER**

**DECLARATION OF JOSH COPENHAVER IN SUPPORT OF SOUTHERN CALIFORNIA EDISON COMPANY'S OPPOSITION TO DEBTOR'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER, PROOF OF SERVICE**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On June 1, 2021, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

David Goodrich (Counsel to Debtor Western Community Energy) - dgoodrich@wgllp.com, kadele@wgllp.com, lbracken@wgllp.com, wggllp@ecf.courtdrive.com

United States Trustee (RS) – ustpregion16.rs.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY OR UNITED STATE MAIL UNITED STATES MAIL**:
On June 1, 2021, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

DEBTOR
Western Community Energy
3390 University Ave., Suite 200
Riverside, CA 92501

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on June 1, 2021, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**Served Via Personal Delivery**
PRESIDING JUDGE'S COPY
Bankruptcy Judge Scott H. Yun
U.S. Bankruptcy Court, Riverside Division
3420 Twelfth Street
Riverside, CA 92501
Bin outside of Courtroom 302

47733096.1 This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**

**Served Via E-Mail:**

ATTORNEY FOR DEBTOR:   David Goodrich, dgoodrich@wgllp.com

UNITED STATES TRUSTEE (RS):   Everett Green, Everett.I.Green@usdoj.gov

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 1, 2021 | Rhonda Clarke | |
|---|---|---|
| Date | Printed Name | Signature |

47733096.1 This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                             **F 9013-3.1.PROOF.SERVICE**